Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
**HATCH LAW GROUP, PC**
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

E. Michelle Drake (*Pro Hac Vice* to be Filed)
emdrake@bergermontague.com
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel. 612-594-5933
Fax. 612-584-4470

*Counsel for Plaintiff and the Proposed Class*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| DANIEL HERNANDEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSTRUCTURE, INC.,<br><br>Defendant, | **CLASS ACTION COMPLAINT<br>JURY TRIAL DEMANDED**<br><br>Case No. 2:26-cv-00527<br><br>Judge _______________ |

Plaintiff Daniel Hernandez ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Instructure, Inc. ("Defendant"), and alleges as follows based on personal knowledge as to his own acts and on investigation conducted by counsel as to all other allegations:

## I. INTRODUCTION

1. Data breaches are preventable. They occur due to the lack of attention and

resources that companies like Defendant expend on protecting the highly sensitive information they are entrusted with.

2. Plaintiff brings this class action against Defendant for its failure to properly secure Plaintiff's and Class Members' personal information, including (i) personally identifiable information ("PII"), *i.e.*, names, email addresses, and student-identification numbers; and (ii) other sensitive personal data, such as course names, enrollment information, and private messages (together with the PII, "Personal Information") in connection with a series of data-security events that affected Defendant's Canvas platform in April and May 2026 (the "Data Breach").[1]

3. Defendant failed to comply with industry standards to protect information systems that contain Personal Information. Plaintiff seeks, among other things, orders requiring Defendant to fully and accurately disclose the nature of the information that has been compromised and to adopt sufficient security practices and safeguards to prevent incidents like the Data Breach in the future.

4. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Personal

[1] *See* Instructure, Inc., *Security Incident Update & FAQs*, https://www.instructure.com/incident_update (last visited May 20, 2026) [*archived at* https://perma.cc/49QT-W5B6] (Defendant's own disclosure); Jai Vijayan, *ShinyHunters Claims Second Attack Against Instructure*, Dark Reading (May 8, 2026), https://www.darkreading.com/cyberattacks-data-breaches/shinyhunters-second-attack-instructure (two-wave intrusion); Lawrence Abrams, *Instructure Hacker Claims Data Theft from 8,800 Schools, Universities*, BleepingComputer, https://www.bleepingcomputer.com/news/security/instructure-hacker-claims-data-theft-from-8-800-schools-universities/ (3.65 TB exfiltrated; 8,809 institutions affected); Ramishah Maruf, *Canvas Hack Strands University Students During Finals Week*, CNN (May 7, 2026), https://www.cnn.com/2026/05/07/us/canvas-hack-strands-college-students-finals-week (student ID numbers among compromised categories).

Information with which it was entrusted.

5. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Personal Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure Personal Information from those risks left that property in a dangerous condition.

6. Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data-retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data-security practices; (5) failing to warn Plaintiff and Class Members of its inadequate data security; (6) failing to encrypt or adequately encrypt the PII; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to employ reasonable and effective data-security procedures free of foreseeable vulnerabilities.

7. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Personal Information and failing to take standard and reasonably available steps to prevent the Data Breach.

8. In addition, Defendant failed to properly maintain and monitor the computer

network and systems that housed the Personal Information. Had it properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Personal Information of Plaintiff and Class Members.

9. Plaintiff's and Class Members' identities are now at high risk because of Defendant's negligent conduct, as the Personal Information that Defendant collected and maintained is now in the hands of data thieves.

10. As a result of the Data Breach, Plaintiff and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiff and Class Members must now, and for years into the future, closely monitor their financial accounts and credit reports to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages.

11. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their PII; and (f) the continued risk to their sensitive Personal Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect what it collected and maintained.

12. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of Plaintiff and all similarly situated individuals whose Personal Information was accessed during

the Data Breach.

13. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, as long-term and adequate credit monitoring services funded by Defendant, injunctive relief including improvements to Defendant's data-security systems and future annual audits, and declaratory relief.

14. The exposure of one's Personal Information to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiff and the Class Members' Personal Information was exactly what it should be—private. Not anymore. Now, their Personal Information is forever exposed and unsecure.

## II. PARTIES

### A. Plaintiff

15. Plaintiff Daniel Hernandez is a citizen and resident of Virginia.

### B. Defendant Instructure, Inc.

16. Defendant Instructure, Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah.

## III. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of Class Members is numerous and many of its members different citizenship from Defendant, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has personal jurisdiction over Defendant because Defendant maintains

its principal place of business in this District, regularly conducts business in this District, and has sufficient minimum contacts in this District.

19. Venue is proper in this Court under 28 U.S.C. § 1391(a)(1) because Defendant is domiciled in this District and a substantial part of the events giving rise to this action occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Overview of Defendant

20. Defendant is the developer and operator of Canvas, a cloud-based learning-management system used by over 8,000 educational institutions worldwide, including schools, colleges, and universities throughout the United States. In the regular course of its business, Defendant collects, processes, and stores the Personal Information of millions of students, instructors, and other Canvas users.

21. Defendant collected Plaintiff's and Class Members' Personal Information and stored it on cloud-based infrastructure that Defendant administers, configures, and controls from its headquarters in Salt Lake City, Utah, where it made the data-security and incident-response decisions that are at the heart of this action.

22. Defendant made promises and representations (from its headquarters in Salt Lake City, Utah) to individuals, including Plaintiff and Class Members, that the Personal Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

23. For instance, Defendant's website states: "Security is built into the fabric of our cloud platform, infrastructure, and processes, so you can rest assured that your data is

safeguarded."[2] Defendant also represents that the Canvas platform "is protected by a comprehensive access control framework" and that "[a]ccess to the platform is secured by authentication, authorization, and 2FA (where applied)."[3]

24. Defendant's CEO, Steve Daly, has personally pledged that Defendant will "build security and privacy into all our products and all areas of our business."[4]

25. Large companies like Defendant have an interest in maintaining the confidentiality of the Personal Information entrusted to them, and they are well aware of the numerous data breaches that have occurred throughout the United States and their responsibility for safeguarding Personal Information in their possession.

26. Defendant represented to consumers and the public that it possesses robust security features to protect Personal Information and that it takes its responsibility to protect Personal Information seriously.

27. Plaintiff and Class Members provided their Personal Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

28. As a result of collecting and storing the Personal Information of Plaintiff and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and Class Members' Personal Information from disclosure to third parties.

---

[2] *Security*, Instructure Trust Center, https://www.instructure.com/trust-center/security [*archived at* https://perma.cc/4ZQQ-PPXG] (last visited May 20, 2026).
[3] *Id.*
[4] *Instructure Trust Center*, Instructure, https://www.instructure.com/trust-center [*archived at* https://perma.cc/4LZM-NBKL] (last visited May 20, 2026).

**B. The Data Breach**

29. On or about April 25, 2026, a criminal hacking and extortion group known as ShinyHunters exploited a vulnerability in Defendant's Free-For-Teacher account program—a feature that permitted educators to create Canvas accounts and submit support tickets without institutional verification—to gain unauthorized access to Defendant's Canvas environment.[5]

30. Defendant did not detect the intrusion until four days later (i.e., April 29, 2026), at which point Defendant revoked the unauthorized access and engaged third-party forensic investigators.[6]

31. On May 1, 2026, Defendant publicly disclosed the incident, acknowledging that an unauthorized actor had obtained identifying information of Canvas users.[7]

32. ShinyHunters has claimed responsibility for exfiltrating approximately 3.65 terabytes of data belonging to approximately 275 million users across approximately 8,809 educational institutions in 50 countries.[8]

---

[5] Jai Vijayan, *ShinyHunters Claims Second Attack Against Instructure*, Dark Reading (May 8, 2026), https://www.darkreading.com/cyberattacks-data-breaches/shinyhunters-second-attack-instructure.

[6] Instructure, Inc., *Security Incident Update & FAQs*, https://www.instructure.com/incident_update (last visited May 20, 2026) [*archived at* https://perma.cc/49QT-W5B6]; *see also* Vijayan, *supra* note 5.

[7] Ramishah Maruf, *Canvas Hack Strands University Students During Finals Week*, CNN (May 7, 2026), https://www.cnn.com/2026/05/07/us/canvas-hack-strands-college-students-finals-week; Lawrence Abrams, *Instructure Hacker Claims Data Theft from 8,800 Schools, Universities*, BleepingComputer, https://www.bleepingcomputer.com/news/security/instructure-hacker-claims-data-theft-from-8-800-schools-universities/.

[8] Abrams, *supra* note 7 (3.65 TB; 8,809 institutions); *Education Sector in the Crosshairs: ShinyHunters' Extortion Campaign Against Instructure*, Halcyon (May 2026), https://www.halcyon.ai/ransomware-alerts/education-sector-in-the-crosshairs-shinyhunters-extortion-campaign-against-instructure (275 million records; 8,809 institutions); *Instructure Strikes Deal with Hackers After Massive Canvas Breach*, MSN (May 2026),

33. Defendant has since confirmed that the compromised data includes users' names, email addresses, student-identification numbers, course names, enrollment information, and private messages exchanged among students, faculty, and staff.[9]

34. Despite declaring the incident "contained" on May 2, 2026, and stating on May 6, 2026 that it was "not seeing any ongoing unauthorized activity," Defendant suffered a second intrusion on May 7, 2026, when ShinyHunters defaced Canvas login pages at approximately 330 institutions worldwide, displaying a ransom demand and threatening to publicly release the stolen data unless Defendant paid by May 12, 2026.[10]

35. On May 11, 2026, the day before that deadline, Defendant announced that it had reached an agreement with ShinyHunters and that it had received purported digital confirmation that the stolen data had been destroyed. Defendant acknowledged that the attack exploited the same access pathway as the first intrusion.[11]

---

https://www.msn.com/en-us/news/insight/instructure-restores-canvas-after-agreement-with-hackers/gm-GME85EE1EE (50 countries).

[9] Instructure, *supra* note 6 ("usernames, email addresses, course names, enrollment information and messages"); *see also* Maruf, *supra* note 7 (student ID numbers).

[10] Vijayan, *supra* note 5 (May 2 statement by Instructure CISO Steve Proud: "We believe the incident has been contained"); *see also Canvas Data Breach Rattles Colleges During Finals Period*, NPR (May 8, 2026), https://www.npr.org/2026/05/08/nx-s1-5815956/canvas-data-breach-school-finals; *ShinyHunters Defaces Canvas Login Portals at 330 Schools in Escalating Extortion Campaign*, Security Boulevard (May 7, 2026), https://securityboulevard.com/2026/05/shinyhunters-defaces-canvas-login-portals-at-330-schools-in-escalating-extortion-campaign/ (330 institutions; May 12 deadline).

[11] Instructure, *supra* note 6 (stating that Instructure "reached an agreement with the unauthorized actor," received "digital confirmation of data destruction (shred logs)," and that "[n]o Instructure customers will be extorted as a result of this incident, publicly or otherwise"; further confirming that "[t]his is the same issue that led to the unauthorized access the prior week"); *see also* Erik van Klinken, *Instructure Pays ShinyHunters to Delete the Data It Stole*, Techzine (May 12, 2026), https://www.techzine.eu/news/security/141195/instructure-pays-shinyhunters-to-delete-the-data-it-stole/.

36. Both the U.S. House Committee on Homeland Security and the Senate Committee on Health, Education, Labor, and Pensions have since opened investigations into the breach and Defendant's response.[12]

37. Defendant failed to prevent the Data Breach because it did not adhere to commonly accepted security standards and failed to detect that its systems were subject to a security breach.

38. The Personal Information that Defendant allowed to be exposed in the Data Breach are the types of private information that Defendant knew or should have known would be the target of cyberattacks.

39. The U.S. Federal Trade Commission ("FTC") directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[13] Immediate notification of a data breach is critical so that those impacted can take measures to protect themselves.

**C. Plaintiff's Experience**

40. Plaintiff Hernandez is a staff member at Liberty University in Lynchburg, Virginia (the "University"). At all relevant times, the University required Plaintiff to use Defendant's Canvas learning-management system. In the course of that compelled use, Defendant acquired and stored Plaintiff's Personal Information on its Canvas platform, including his name, school-

---

[12] Jai Vijayan, *Congress Puts Heat on Instructure After Canvas Outage*, Dark Reading (May 14, 2026), https://www.darkreading.com/cyberattacks-data-breaches/congress-instructure-shinyhunters-attacks (House Committee on Homeland Security); *Netizen: Monday Security Brief (5/18/2026)*, Netizen Blog (May 18, 2026), https://blog.netizen.net/2026/05/18/netizen-monday-security-brief-5-18-2026/ (Senate Committee on Health, Education, Labor, and Pensions).

[13] *Protecting Personal Information: A Guide for Business*, FED TRADE COMM'N, (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited May 20, 2026).

issued email address, identification number, and the substantive contents of his private communications conducted through the Canvas Inbox feature with faculty, staff, and students. Plaintiff had no meaningful ability to negotiate, opt out, or withhold his data as a condition of his employment.

41. In early May 2026, Plaintiff received a series of emailed notice regarding the Data Breach from the University, none of which offered any meaningful information about the cause of the Data Breach, the specific categories of Plaintiff's Personal Information that were accessed and exfiltrated, the duration of the unauthorized access, or the steps Defendant has taken (if any) to confirm that Plaintiff's exfiltrated data has in fact been deleted from the threat actor's possession.

42. Defendant has stated publicly that it paid a ransom in exchange for "digital confirmation" that the stolen data was destroyed, but no independent verification of that destruction is possible, and the cybersecurity community has consistently recognized that data exfiltrated by extortion groups like ShinyHunters is routinely retained, resold, or used in future extortion attempts notwithstanding any such assurance.

43. As a result of the Data Breach, Plaintiff has spent and will continue to spend significant time mitigating its consequences. This includes time spent researching the Data Breach, changing passwords for multiple online accounts; verifying the legitimacy of suspicious communications—including phishing emails and impersonation attempts—directed to the school-issued email address that Plaintiff used with Canvas; monitoring Plaintiff's financial accounts and credit reports for fraudulent activity; and exploring credit-monitoring and identity-theft protection services. This time has been lost forever and cannot be recaptured.

44. Plaintiff's reasonable mitigation steps were not a self-inflicted harm. Defendant's failure to safeguard Plaintiff's Personal Information, and Defendant's failure to provide Plaintiff with a meaningful explanation of what was taken, what has become of it, and what steps Defendant is taking to prevent further harm, made each of these mitigation steps necessary. Plaintiff would not have incurred them but for the Data Breach.

45. Plaintiff is very careful about sharing his sensitive Personal Information and diligently maintains his Personal Information in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive Personal Information over the internet or via any other unsecured method.

46. Plaintiff has suffered lost time, annoyance, interference, and inconvenience, and has experienced lost sleep, fear, anxiety, stress, and frustration arising from the loss of his Personal Information and the violation of his privacy. That distress has been compounded by Defendant's failure to disclose the specific categories of Plaintiff's Personal Information that were accessed and by the public claims of the threat actor, ShinyHunters, that it exfiltrated billions of private messages exchanged on the Canvas platform—messages that, by their nature, could include communications about academic difficulties, mental-health concerns, disability and accommodation requests, Title IX matters, disciplinary issues, and other personal subjects ordinarily shared with educational institutions only in the strictest confidence.

47. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of his Personal Information—a form of intangible property that Plaintiff was required to provide as a condition of his employment with the University and that Plaintiff entrusted to Defendant on the understanding it would be safeguarded. Plaintiff has also been deprived of his

right to exclude others from accessing that information, which was compromised in and as a result of the Data Breach.

48. Plaintiff has suffered present, imminent, and impending injury arising from the substantially increased and ongoing risk of fraud, identity theft, educational fraud, account impersonation, and highly contextualized phishing and social-engineering attacks crafted using the contents of his Canvas communications and school-issued identifiers—all resulting from Plaintiff's Personal Information being placed in the hands of ShinyHunters, a known criminal extortion group with a documented track record of retaining, reselling, and publicly releasing stolen data.

49. Plaintiff has a continuing long-term interest in ensuring that his Personal Information, which on information and belief remains in Defendant's possession, is protected and safeguarded from future breaches. That interest is particularly acute here, where Defendant's systems have already been shown to be susceptible to compromise—not once but twice in less than two weeks—by the same threat actor, demonstrating that Defendant's data-security failures are systemic and ongoing.

**D. Injuries to Plaintiff and Class Members**

50. As a direct and proximate result of Defendant's actions and omissions in failing to protect Plaintiff and Class members' Personal Information, Plaintiff and Class members have been injured.

51. Plaintiff and Class members have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to

prevent and mitigate credit fraud, identity theft, and financial fraud.

52. In addition to the irreparable damage that may result from the theft of Personal Information, identity theft victims must spend numerous hours and their own money repairing the impacts caused by a breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[14]

53. In addition to fraudulent charges and damage to their credit, Plaintiff and Class Members may spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity-theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; and (j) paying late fees and declined payment penalties as a result of failed automatic payments.

54. Additionally, Plaintiff and Class Members have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their Personal Information is used, the diminution in the value or use of their Personal Information, and the loss of privacy.

**E. Securing Personal Information and Preventing Breaches**

55. Defendant could have prevented this Data Breach by properly securing and

---

[14] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf. (last visited May 20, 2026)

encrypting the Personal Information of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an internet-accessible environment when there was a reasonable need to do so.

56. Defendant's negligence in safeguarding the Personal Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

57. Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the Personal Information of Plaintiff and Class Members from being compromised.

58. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

59. The ramifications of Defendant's failure to keep secure the Personal Information of Plaintiff and Class Members are long lasting and severe. Once Personal Information is stolen, particularly Social Security Numbers, fraudulent use of that information and damage to victims may continue for years.

---

[15] 17 C.F.R. § 248.201 (2013).
[16] *Id.*

**F. The Value of PII**

60. It is well known that Personal Information and Social Security Numbers are an invaluable commodity and a frequent target of hackers.

61. People place a high value not only on their Personal Information, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[17]

62. People are particularly concerned with protecting the privacy of their financial account information and Social Security Numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[18] There are long-term consequences to data breach victims whose Social Security Numbers are taken and used by hackers. Even if they know their Social Security Numbers have been accessed, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security Number misuse. Even then, the Social Security Administration has warned that "a new number and won't guarantee you a fresh start," and that "[f]or some victims of identity theft, a new number actually creates new problems."[19]

63. The Personal Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price

---

[17] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf. (last visited May 20, 2026).

[18] Cameron Huddleston, *How to* Protect *Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 9, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html. (last visited May 20, 2026).

[19] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6–7, https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited May 20, 2026).

ranging from $40 to $200, and bank details have a price range of $50 to $200.[20]

64. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x in price on the black market."[21]

65. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

66. The fraudulent activity resulting from the Data Breach may not come to light for years.

67. There may be a time lag between when harm occurs versus when it is discovered, and also between when Personal Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

68. At all relevant times, Defendant knew, or reasonably should have known, of the

---

[20] *Your personal data is for sale on the dark web. Here's* how *much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/. (last visited May 20, 2026).

[21] Time Greene, Anthem *Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html. (last visited May 20, 2026).

[22] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf. (last visited May 20, 2026).

importance of safeguarding the Personal Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

69. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Personal Information.

70. Defendant knew of the unique type and the significant volume of data contained in the Personal Information that Defendant stored on its networks, and, thus, the significant number of individuals who would be harmed by the exposure of the data.

71. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Personal Information of Plaintiff and Class Members.

**G. Industry Standards for Data Security**

72. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[23]

73. In light of the numerous high-profile data breaches targeting companies like Cisco Systems, AT&T, Dell Technologies, Snowflake, Ticketmaster, and PowerSchool, Defendant knew of the importance of safeguarding Personal Information, as well as of the foreseeable

---

[23] *How to* Protect *Your Networks from Ransomware*, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view. (last visited May 20, 2026).

consequences of its systems being breached.

74. Therefore, the increase in such attacks, and the attendant risk of future attacks, were widely known to the public and to anyone in Defendant's industry, including Defendant.

75. Security standards that are commonly accepted among businesses that store Personal Information using the Internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Monitoring for suspicious or irregular traffic to servers;

c. Monitoring for suspicious credentials used to access servers;

d. Monitoring for suspicious or irregular activity by known users;

e. Monitoring for suspicious or unknown users;

f. Monitoring for suspicious or irregular server requests;

g. Monitoring for server requests for PII;

h. Monitoring for server requests from VPNs; and

i. Monitoring for server requests from Tor exit nodes.

76. The FTC publishes guides for businesses for cybersecurity[24] and protection of PII[25] which includes basic security standards applicable to all types of businesses.

77. The FTC recommends that businesses:

a. Identify all connections to the computers where sensitive information is stored.

---

[24] *Start with* Security*: A Guide for Business*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 20, 2026).

[25] *Protecting* Personal *Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited May 2026).

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d. Scan computers on the business network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e. Pay particular attention to the security of business web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

78. The FTC has brought enforcement actions against businesses for failing to

adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[26]

79. Because Plaintiff and Class Members entrusted Defendant with Personal Information, Defendant had a duty to keep the Personal Information secure.

80. Plaintiff and Class Members reasonably expect that when their Personal Information is provided to a sophisticated business for a specific purpose, that business will safeguard their Personal Information and use it only for that purpose.

81. Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

## V. CLASS ALLEGATIONS

82. This action is brought as a class action under Fed. R. Civ. P. 23.

83. Plaintiff brings this action on behalf of himself and the following nationwide Class:

> All current and former users of the Canvas platform operated by Instructure, Inc., residing in the United States whose data was accessed, stolen, and/or exfiltrated by one or more unauthorized third parties as a result of the Data Breach.

84. Excluded from the Class are Defendant, its officers, directors, and any entity in

---

[26] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited October 22, 2025).

which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the class are the members of the judiciary to whom this case is assigned, their families, and all members of their staff.

85. Plaintiff reserves the right to amend or modify the Class definition or to create subclasses as this case proceeds based upon discovery and further investigation.

86. ***Numerosity***: The Class is so numerous that joinder of all members is impracticable, evidenced by the large number of individuals presently known to have been injured by Defendant's conduct. The Class is ascertainable by records in the possession of Defendant or third parties.

87. ***Commonality***: Questions of law or fact common to the Class include, without limitation:

a. Whether Defendant owed a duty or duties to Plaintiff and Class Members to exercise due care in collecting, storing, safeguarding, and obtaining their PII;

b. Whether Defendant breached that duty or those duties;

c. Whether Defendant failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

d. Whether the security provided by Defendant was satisfactory to protect Personal Information as compared to industry standards;

e. Whether Defendant misrepresented or failed to provide adequate information regarding the type of security practices used;

f. Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' Personal Information secure and prevent loss or misuse of that PII;

g. Whether Defendant acted negligently in connection with the monitoring and protecting of Plaintiff's and Class Members' PII;

h. Whether Defendant's conduct was intentional, willful, or negligent;

i. Whether Plaintiff and Class Members suffered damages as a result of Defendant's conduct, omissions, or misrepresentations; and

j. Whether Plaintiff and Class Members are entitled to injunctive, declarative, and monetary relief as a result of Defendant's conduct.

88. ***Typicality***: Plaintiff's claims are typical of the claims of Class Members. Plaintiff and Class Members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

89. ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff's counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

90. ***Predominance and superiority***: Questions of law or fact common to Class Members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class Members is impracticable and the amount at issue for each Class Member would not justify the cost of litigating individual claims. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and

comprehensive supervision by a single court. There are no known difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

91. Further, Defendant's unlawful conduct applies generally to all Class Members, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of the Class)

92. Plaintiff realleges and incorporates by reference herein all preceding paragraphs as if fully set forth herein.

93. Defendant owed a duty of care to Plaintiff and Class Members to use reasonable means to secure and safeguard the entrusted Personal Information, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems. These common law duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their Personal Information because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendant knew that it was more likely than not Plaintiff and Class Members would be harmed by such exposure of their Personal Information.

94. Defendant's duties to use reasonable security measures also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members

entrusted their Personal Information with Defendant, Defendant accepted and held the Personal Information, and Defendant represented that the Personal Information would be kept secure pursuant to its data security policies. Defendant could have ensured that its data-security systems and practices were sufficient to prevent or minimize the Data Breach.

95. Defendant's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Personal Information. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty. Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

96. Defendant breached the aforementioned duties when it failed to use security practices that would protect Plaintiff's and Class Members' Personal Information, thus resulting in unauthorized third-party access to the Plaintiff's and Class Members' Personal Information.

97. Defendant further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff's and Class Members' Personal Information within its possession, custody, and control.

98. As a direct and proximate cause of failing to use appropriate security practices, Plaintiff's and Class Members' Personal Information was disseminated and made available to unauthorized third parties.

99. Defendant admitted that Plaintiff's and Class Members' Personal Information was

wrongfully disclosed as a result of the Breach.

100. The Breach caused direct and substantial damages to Plaintiff and Class Members, as well as the possibility of future and imminent harm through the dissemination of their Personal Information and the greatly enhanced risk of credit fraud or identity theft.

101. By engaging in the forgoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendant's conduct was negligent and departed from reasonable standards of care including by, including but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class Members' Personal Information.

102. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Personal Information would not have been compromised.

103. Neither Plaintiff nor the Class contributed to the Breach or subsequent misuse of their Personal Information as described in this Complaint.

104. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have been put at an increased risk of credit fraud or identity theft, and Defendant must mitigate damages by providing adequate credit and identity monitoring services.

105. Plaintiff and Class Members are entitled to damages for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of one year.

106. Plaintiff and Class Members are entitled to damages to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their Personal

Information, including the amount of time Plaintiff and Class Members have spent and will continue to spend as a result of Defendant's negligence.

107. Plaintiff and Class Members are entitled to damages to the extent their Personal Information has been diminished in value because Plaintiff and Class Members no longer control their Personal Information and to whom it is disseminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

a. For an order certifying the Class, appointing Plaintiff as Class Representative, and appointing the law firms representing Plaintiff as counsel for the Class;

b. For compensatory and punitive damages in an amount to be determined at trial;

c. Payment of costs and expenses of suit herein incurred;

d. Both pre-and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and expert fees; and

f. Such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby respectfully demands a trial by jury.

Dated: June 8, 2026

Respectfully submitted,

*/s/ Brent O. Hatch*
**HATCH LAW GROUP, PC**
Brent O. Hatch
Adam M. Pace

**BERGER MONTAGUE PC**
E. Michelle Drake

*Counsel for Plaintiff and the Proposed Class*